Oakley, Ch. J.
These actions are brought to recover penalties, under the act of the legislature conferring certain powers on the port-wardens of this city.'
The case out of which the first action arose, was that of the Jenny Lind, a barque owned in England, which arrived in this port in a damaged state, having a cargo of merchandise on board. Upon her arrival, the consignees applied to the defendant, Cartwright, to make a survey upon her, and to determine what repairs were necessary. This was done before the cargo was discharged, or any measures taken in reference to any future voyage. Cartwright, acting under the application thus made to him, went on board of the vessel, and determined what repairs were necessary to render her sea-worthy, but without' reference to any particular voyage. He merely judged what would be needed to put her generally in a sea-worthy condition. The port-wardens contend that in doing so, he has committed a violation of the statute, which confers upon them exclusively *241 the power and authority of surveying vessels deemed unfit to proceed to sea, and to be judges of the necessary repairs.
By the act of March, 1844, it is provided that, “ if any person or persons shall, under any pretence whatever, do, perform, or exercise any of the powers, functions, or duties, or services belonging to or appertaining to the port-wardens, specified in the act, entitled 1 An act to reduce the laws particularly relating to the city of New York into one act, so far as the same relates to the master and wardens, harbor-master and pilots of the port of New York, and their duties, and for other purposes,’ passed February 19th, 1819, each and every person so offending shall, for each and every offence, forfeit and pay to the master and wardens of the port of New York, the sum of fifty dollars, to be sued for and recovered by them in the manner specified.”
It is necessary to look at the act of February, 1819, thus referred to, in order to see what are the duties which that act authorizes the port-wardens to perform.
The fifth section of that act provides, that the port-wardens, ■or any two of them, shall be surveyors of any vessel deemed unfit to proceed to sea, and shall be judges of the repairs which may be necessary for the safety of such vessel on the intended voyage. Was any thing done by the defendant in violation of this act ? Was any thing done which the law empowers the port-wardens only to do ? It will be perceived by the plain import of this section, that it was not intended by the legislature to confer an exclusive power on the port-wardens in this respect; in all cases their power is clearly limited. In this case, it does not appear that any particular voyage was contemplated, but it is contended by the port-wardens that the meaning .of the words “ the intended voyage” is equivalent to the words “ any intended voyage,” or rather, that they include any future voyage, though not contemplated at the time of the repairs. On the part of the defendant, it is insisted that there must be some particular, specified voyage, in order to bring the case within the statute..
The act in question is restrictive of the common-law right of every man to repair his own vessel, through his own agent, and in his own way; and it is, moreover, of a highly penal charac *242 ter. It ought not, therefore, to be extended beyond its letter. There may be, and doubtless are, good reasons for appointing persons whose duty it shall be to see whether any vessel is fit or safe for any intended voyage actually set on foot. In such a case, the passengers (if any) and crew of a vessel may have an interest in inquiring into her safety for that particular voyage, .and may apply to the port-wardens, as official characters, to ascertain the same. But we think that, before the cargo is discharged, or any particular voyage is contemplated, the agent or owner can employ any person to inspect or repair the vessel. The words of the act are repugnant to the idea that a general unlimited power to survey vessels, and judge of necessary repairs, was intended to be given to the port-wardens. This construction is in accordance with the letter, and, as we think, the spirit of the act. If a vessel is going to Canton, she would require very different repairs or equipments from those that might be necessary if she were going on a( summer voyage'to Bermuda. This may illustrate the reason why the power of the port-wardens was confined to the survey of vessels in reference to some particular voyage.
We are of opinion that, by the just construction of this penal statute, the defendant has not done any thing which is forbidden by it, and that he has not incurred any penalty under it.
The second case is that of the brig Yelasco.
In this case, the Yelasco, owned in Massachusetts, on a voyage from Havana to Cowes, put into New York in distress, and required repairs to complete her voyage. There was, therefore, in this case, a particular voyage, in relation to which the act complained of was done. The answer of tbe defendant states, that “he was requested by the master and consignees of the barque to examine the vessel, in company with Mr. Poillon, a shipwright, and to give his opinion as to the repairs that she required. That, in pursuance of such request, this defendant and Poillon examined the brig, and found that she was strained, and several streaks of the wales started ofi^ and recommended them taken out, and new streaks put in, and the vessel re-tree- *243 nailed from her copper up, and strengthened by 18 pairs of hanging knees being put in under the lower deck beams; a breast hook being put in forward, a pointer in aft, a new tiller and stanchions to the wheel, and all the seams aboye the copper to be thoroughly caulked, and also that the brig should he taken out and her bottom examined.”
There was here no final adjudication as to what repairs were necessary. The party only gave an opinion that certain repairs ought to be made. There was no determination as to what repairs were necessary to enable the vessel to pursue her voyage. The defendant does not, as we think, come within the terms of the act, as a further survey and examination were recommended before judging whether the repairs particularly specified were sufficient for the safety of the vessel in the prosecution of the voyage in which she .was engaged.
The case comes before us upon the pleadings only, and, considering the acts of the defendant as set out in his answer, it does not appear to us that they amount to a violation of the law, being only partial and unconsummated.
The third case is that of the Proteus.
This is an appeal from a judgment at special term, given on a demurrer to the plaintiff’s reply. The same questions occur here that arose in the first case, and there is no necessity, therefore, of examining them further. We have the opinion of the judge on the decision of the case at the special term. It accords, in principle, with the views already expressed, and we fully concur in it. The judgment in this case must be affirmed. In the other two cases, judgment must be rendered for the defendant.
Sandford, J., concurred.
Paine, J.
I acquiesce in the opinion of the court in this case, and in the reasons upon which it is founded. Those-reasons I understand to be, that the statute upon which the plaintiffs sue, is against common right, and is therefore to be construed strictly; and that the plaintiffs have not made out such a state of facts as entitles them to sue upon it.
*244 But as there are reasons, which are'much more satisfactory to my mind, why the plaintiffs are not entitled to recover, I prefer assigning them as the grounds of my opinion, and in doing so, I wish it to be understood, that they have not been adopted by the other members of the court.
The action is brought to recover a penalty of fifty dollars; and the offence alleged is, that the defendant went on board the barque Yelasco, while lying in the port of New York, and made a survey of said, barque, and judged of the repairs which were necessary for the safety of the said vessel on her intended voyage. And this offence is alleged to be created by the act of the state of New York, passed March 24th, 1844, entitled “ An act to amend the act therein referred to, declaring the rights, and for the relief of the master and wardens of the port of New York.”
The provision of the act of 24th March, upon which the plaintiffs rely, is in the following words: “ That if any person or persons shall, under any pretence whatever, do, perform, or exercise any of the powers, functions or duties of the master and wardens of the port of New York, by doing any of the acts, or performing any of the duties or services belonging or appertaining to them or their said office, specified in the act, entitled ‘ An act to -reduce the laws particularly relating to the city of New York into one act, so far as the same relates to the master and wardens, harbor-master and pilots of the port of New York, and their duties, and for other purposes,’ passed February 19th, 1819, or which otherwise belong, or appertain to the said office, by virtue of any existing law of this state, or of the United States, each and every person so offending shall, for each and every offence, forfeit and pay to the master and wardens of the port of New York, the sum of-fifty dollars, to be sued for and recovered by them in their' corporate name, with costs of suit, in any court having cognizance thereof; the one half thereof, when recovered, to their own use, and the other half to the use of the pilots’ charitable fund, in the city of New York.”
The powers of the master and wardens, which the defendant is alleged to have exercised in violation of the above act, are conferred upon them by that part of the 5th section of the act *245 of 19th February, 1819, which is in the following words: “ That the said master and wardens of the port of New York, or any two of them, with the assistance of one or more skilful carpenters', shall be surveyors of any vessel deemed unfit to proceed to seaand the said master and wardens, or any two of them, shall be judges of the repairs which may be necessary for the safety of such vessel on the intended voyage.”
It appears that the Yelasco was owned in Massachusetts, and had, on a voyage from Havana to Cowes, in the Isle of Wight, put into New York in distress. That she was also insured in Massachusetts, and that the defendant, as agent of the insurance company, in company with a shipwright, examined the vessel, and recommended certain repairs to be pnt upon her, which is the offence for which this suit is brought.
In my opinion, that part of the act of 24th March, 1844, which creates the offence complained of, is a violation of that provision of the constitution of the United States, which empowers Congress “ to regulate commerce with foreign nations and among the several states.”
It may be thought that a state tribunal should be solicitous rather to assert and defend the powers of its own state legislature than those of Congress; and that it does not become it to question the constitutionality- of a state law, until it shall have been declared to be Void by the courts of the Union. This sentiment, so generally entertained, is certainly entitled to respect, and I might not be insensible to its influence in a case where the interests of the citizens of this state would be greatly prejudiced by the decision.
But according to my view of tne consequences of the lavtin question, the citizens of the state of New York are more deeply interested than those of any other state, in a decision against its constitutionality.
I would not be understood as. characterizing this law, as in itself greatly injurious or unjust; it is the principle which it sanctions and establishes, which I think is pregnant with mischievous consequences. If the state of New York sets the example of imposing restraints upon navigation and commerce, it *246 may, and no doubt will, be followed by every other state in the Union. And laws which are much more inconvenient and burdensome, may be defended upon the principle of our own.
The first requisite ■ to the prosperity of commerce is, that it should be subjected to no1 unnecessary restraints; the second, that such restraints as are' necessary should be as uniform and universal as possible. It was for this latter purpose, in a great measure, that the Union was formed, and in order that the power of regulating commerce for all the states might be confided to a single government. Perhaps no inconvenience was more severely felt by the states, before their union, than their conflicting laws in relation to commerce. Under so imperfect a system the depression of commerce became intolerable; but the moment uniformity was introduced under the constitution, every hope which had been formed was instantly realized.
I believe, therefore, that it is deeply the interest of every state in the Union, and especially of the most commercial of all the states, to leave the regulation 'of commerce exclusively to the government of the United States, to which, in my opinion, it exclusively belongs.
And this leads me to the two considerations upon which I think the decision of this case depends. First, whether Congress has exclusive power to regulate foreign commerce; and secondly, whether the law in question is an invasion of their power.
It will be remembered, that the provision of the statute, upon which this action is brought, is quite new, no such law having existed until 1844. The general law constituting the board of wardens, and prescribing their powers and duties, is among our oldest laws, and has never been questioned nor disturbed. Nor is it my desire or purpose, -in any way, to question its constitutionality. Its object is undoubtedly to provide facilities and advantages for foreign commerce, which Congress has not thought proper to provide. But it does not attempt to force them upon commerce, or to bind commerce to adopt them. It leaves commerce perfectly free, and is not therefore an attempt to regulate commerce.
But it is the object of the act of 1844, to compel all vessels *247 entering the port of New York, whether from foreign countries, or the sister states, if they require a survey or examination before leaving port, to employ the wardens of the pbrt to make such survey. That this is a regulation of commerce, I suppose cannot be doubted; and the only question which can be made about it is, whether it is an invasion of the power vested in Congress.
I do not propose to enter into a discussion of the question, whether the power of Congress to regulate commerce is in every instance and to every extent an exclusive power. The decision of that question belongs to the supreme court of the United States, where it has recently been much discussed, and where it seems yet to remain in dispute. Many cases have arisen in that court supposed to involve this point, and most of them quite lately, which the court have been greatly embarrassed to dispose of. In one respect they all belong to the same class. They are cases where the internal interests of a state are involved, and where there therefore exists a necessity for state legislation, besides the legislation of Congress. Such have been the cases arising out of the laws of the states providing regulations respecting the importation of foreign paupers, the importation of contagious diseases, the sale of imported spirituous liquors, the regulation of navigable waters so as to prevent their affecting the public health. (Passenger Cases, 7 How. S. C. R 283; License Cases, 5 Ibid. 504; Blackbird Creek Marsh Company, 2 Peters, 250; New York v. Miln, 11 Peters, S. C. R. 130; Brown v. State of Maryland, 12 Wheat. 419; Groves v. Slaughter, 15 Peters, 511.)
In many of these cases, it is impossible to deny that the states have a right to pass laws, although such laws incidentally cover the same ground as the power of Congress. In other cases, it is extremely difficult to determine whether it is a case in which a state ought to be permitted to legislate, and whether the whole subject does not belong to Congress. The discussion of these cases has lately led to a decided difference of opinion among the judges of the supreme court, upon the question whether the power of Congress to regulate commerce, was in all respects an *248 exclusive power. And, indeed, it seems to have been thought that the decision of some of the cases depended, in some measure, upon the decision of that question.
It might seem unfortunate, that the discussion of these cases was allowed to involve the general question of the exclusiveness of the power of Congress over commerce. (Passenger Cases, 7 How. U. S. R. 480-1, 471; License Cases, 5 How. R. 579, 583.) A distinction, however, has always been taken in these cases, in respect to this power, between such portions of commercial incidents as were wholly foreign, and such as were also partly domestic. That such a distinction exists is very obvious. But Until these recent cases arose, where the states had clearly an interest of their own in what they attempted to do, I think I may safely say it was never questioned that the entire power of Congress over commerce was throughout exclusive.
It appears to me, that these cases do not depend at all upon the question as to the exclusiveness of the power of Congress over commerce, but upon the question, whether the state law was passed under a reserved power of the state. This is the view taken of them by Oh. J. Marshall, in Gibbon v. Ogden, (9 Wheat. 203.) He says expressly, in speaking of inspection laws, “ It cannot be admitted, that a power to regulate commerce is the source from which the right to pass them is derived. (Contra, Ch. J. Taney, License Cases, 5 How. R. 532-3.) They form a portion of that immense mass of legislation, which embraces every thing, within the territory of a stale, not surrendered to the general government; all which can be most advantageously exercised by the states themselves Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those tvhich respect turnpike roads, ferries, &c., are component parts of this mass. No direct power over these subjects is granted to Congress; and consequently they remain subject ‘o state legislation.”
But whatever may have been said incidentally aid as matter of argument in these cases, about the power of Coigress over commerce, I think the highest authority can be shovn, that the *249 regulation of what is unmixed foreign commerce belongs exclusively to Congress. The Federalist, in the 42d number, treats of the power of Congress over commerce, and assigns a single reason only why it is lodged with that body, viz., that we may become one nation in respect to other nations. This can only mean, that uniformity of regulation will be secured by unity of legislation. And it is perfectly evident, that the great reason for confiding this power over commerce to Congress, was, to secure such uniformity — a uniformity which could never be attained if the states continued to legislate. If this be so, then a a power remaining in the states to regulate commerce, would be contradictory and repugnant to the power vested in Congress, as the rule is laid down in the 32d number of the Federalist; and it is an instance of repugnancy, precisely like that given by the Federalist, in support or illustration of the rule, which is, the power of Congress “ to establish an uniform rule of naturalization throughout the United States.” And the reason applied by the Federalist to that instance, applies equally to this, viz.: “ This must necessarily be exclusive: because if each state had power to prescribe a distinct rule, there could be no uniform rule.".
In Ogden v. Saunders, (12 Wheat. 307-8,) Mr. J. Thompson, who never inclined to construe the powers of Congress as exclusive, admits, that powers, granted to Congress for national purposes, are exclusive in themselves, without any corresponding prohibition upon the states. The reason there, is evidently the same as that given by the Federalist, viz., that they must necessarily be exclusive, in order that we may be one nation.
The opinions of those who were engaged in framing the constitution, respecting its construction, have always been considered the highest authority; and the rules above referred to, laid down in the Federalist, have been implicitly followed by the supreme court. The opinions of those who composed the first Congress, after the adoption of the constitution, have been almost equally respected, (Houston v. Moore, 5 Wheat. 26; Martin v. Hunter’s Lessee, 1 Ibid. 851,) that Congress having numbered among its members many of the framers of the constitution. The first *250 dozen acts passed by that Congress are principally devoted to the regulation of commerce, and among them is one which declares, that the pilots in the waters of the United States shall continue to be regulated in conformity with the existing or future laws of the states, until further legislative provisions shall be made by Congress.
Now this law expresses, unmistakably, the opinion of the Congress which passed it, upon the question, whether they had exclusive power over commerce. Such a law would have been entirely unnecessary, if Congress had supposed the states had power to pass laws regulating pilots without it. Nor can I see that the force of this argument is in the slightest degree impaired by the fact, (supposing it to be so,) that Congress had no right thus to delegate their legislative power to the states. This only shows that Congress, in this respect, may have been mistaken. But it leaves untouched, the opinion of Congress,_ that the states had no power, except what it gave them. (See opinion of Ch. J. Taney in the License cases, 580.)
In the leading case of Gibbons v. Ogden, (9 Wheat. 1,) the opinion of the court was delivered by Ch. J. Marshall, and was not dissented from by any member of the court. In this opinion, the court maintain, with irresistible reasoning, that the power of Congress over foreign commerce, including navigation, is an exclusive power, and that the state law is repugnant to it. It is perfectly true that, in consequence of the magnitude of the case, and the situation in which the court found itself, of being obliged to declare a state law void, which had enlisted on its side the power, the influence, and deep interest of the first state in the Union, the court, after having shown the law to be void, because the power over commerce was exclusive, went further, and also showed that it was void, because it conflicted with the laws of Congress. I am unable to comprehend how it should ever have been insisted (opinion of Daniel, J., Passenger cases, 7 How. R., 499,500; opinion of Taney, Ch. J., License cases, 5 How. R., 502-4) that this was a waiver or abandonment by the court, of the first and main ground which it had taken; especially, when after the opinion follows the decree of the court, declaring *251 the law to be void, because it was repugnant to the constitution, and saying nothing of its conflicting with the laws of Congress.
The case of Gibbons v. Ogden remains undisturbed, so far as foreign commerce is concerned, by any subsequent decision, nor do I believe that it has ever been the intention of a single judge, in any opinion delivered in the supreme court, to question its authority in this respect.
It remains to be considered, whether the provision of the law in question is an attempt to regulate foreign commerce or navigation, and for that reason is repugnant to the constitution of the United States.
The object of the law has no connection with the internal affairs of the state. It is true that the law relates to ships in port, but only in order to ascertaining whether they are in a fit state to go to sea. While a ship remains in port, the state or its citizens have no interest in her being fit for sea, and when she leaves port, the jurisdiction and power of the state over her entirely ceases. The law in effect says, that a damaged ship shall not proceed to sea, or on a foreign voyage, unless she shall have been surveyed by the wardens of the port. Eor, obviously, a damaged ship must be repaired, and if all persons, except the wardens, are forbid to judge of what repairs are necessary, the effect of the law is, to prevent a damaged ship from going to sea, unless the wardens have surveyed her. Now this, I suppose, is too clearly an attempt to regulate foreign commerce to require further argument. It is clearly an attempt to regulate commerce, and to do nothing else; and it is equally clear that it is not at all an attempt to regulate domestic commerce.
The only ground upon which this law has been attempted to be justified is, that it was passed for the protection or safety of those going to sea, and especially of our own citizens. A state might, for the same reason, direct of what materials, and in what manner, ships should be built; or provide that they should not carry gunpowder or combustibles; or, that in time of war they should go armed, or not sail without convoy; or, indeed, lay an embargo in time of war, and forbid their going to sea at all.
*252 "When tbe constitution was adopted, tbe state of New York consented that tbe safety of its citizens, in all these respects, should be taken-care of and provided for by Congress. They surrendered to Congress their whole power over the subject. And surely with great wisdom. For if the state of New York were to put forth all its power for the protection of its citizens on the high seas, it would be utterly insignificant; while, under the protection of the laws and .flag of the Union, their safety is secured, so far as it can be done by human power or foresight.
In the first two cases, judgment for the defendant. In the third case, judgment of the special term affirmed.